# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | 2:10-cr-00276-JCM-LRL |
| v. ) | |
| ) | MOTION TO DISMISS FOR |
| ROBERT RUDE, ) | OUTRAGEOUS GOVERNMENT |
| ) | CONDUCT (#25) |
| Defendant. ) | |

## REPORT & RECOMMENDATION

The defendant, Robert Rude, is under indictment on one count of possession and transfer of a machine gun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2) (Count One); one count of possession of an unregistered machine gun in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Count Two); one count of manufacture of a machine gun in violation of 26 U.S.C. §§ 5822, 5861(f), and 5871 (Count Three); and one count of obliteration of a serial number on a machine gun in violation of 26 U.S.C. §§ 5842, 5861(g), and 5871 (Count Four). This case comes before the court on Rude's Motion to Dismiss for Outrageous Conduct (#25), in which he alleges the government engaged in conduct so outrageous as to amount to a due process violation. The court has considered the motion (#25), the government's Opposition (#32), and Rude's Reply (#33).

## BACKGROUND

Based on the exhibits attached to the parties' papers, the following facts are deemed established and relevant to the disposition of of the motion. On April 20, 2010, detectives with the Las Vegas Metropolitan Police Department ("Metro") Firearms Investigation Section learned that Rude, a person believed to be manufacturing machine guns, had placed an ad for a roommate on Craigslist.com. Metro

detective, A. Anderson, acting in an undercover capacity, contacted Rude about the room, located at 4200 Paradise Road, Apartment #2070, in Las Vegas, Nevada. Anderson met Rude at the apartment later that day. Prior to traveling there, and during all subsequent meetings, he was outfitted with a recording device.

Anderson arrived at the Paradise Road apartment at approximately 2:20 p.m. Rude greeted Anderson and introduced him to Lori, Rude's personal aid. Rude is paraplegic and confined to a wheelchair. Upon entering the apartment, Anderson observed an AK47 style rifle in the corner of the living room and some tools associated with the manufacture of machine guns, including a drill press, screw drivers, springs, and mallets. Anderson asked if Rude was "into heaters,"[1] to which Rude replied, "Ya. I build them."

After a few minutes, Anderson again spoke to Rude about "heaters." Rude offered that he purchased weapons in pieces through cold war surplus, then re-assembled them into working firearms. Anderson indicated that he was interested in purchasing some fully automatic weapons, or machine guns. Rude said he had ten fully automatic weapons that he would sell for $500-$600 each. When Anderson asked to see them, Rude explained that he'd moved the weapons to a "safe place" because his former roommate had threatened to report him to the police. After discussing the price for the room, Anderson said he'd consider the apartment and contact him later. He returned later that day with a deposit for the room.

A couple of days later, on April 22, 2010, Anderson returned to the apartment to pay Rude the $400 rent. He stayed at the apartment for a short time and again asked about obtaining guns from Rude. Rude said he would not bring the guns back from his mother's residence until he was sure his old roommate hadn't turned him in. Anderson asked where he'd learned to convert weapons to fully automatic, and Rude explained that he read a lot on the internet and in books. Anderson observed at least seven rifles in Rude's bedroom before leaving the apartment that day.

---

[1] "Heaters" is common street slang for firearms.

On May 4, 2010, Anderson went to the apartment to move in some belongings and to hang around with Rude. No one was at the apartment when he arrived, so he looked around and noted several more parts to AK style rifles lying about the apartment. He also looked into Rude's bedroom and saw several rifles hanging on the wall. When Rude and Lori arrived soon thereafter, Rude had two AK style rifles laying between his legs and one rifle across his lap; Lori was carrying another rifle. Rude headed over to Anderson and immediately started talking about guns, converting guns to fully automatic, and building guns that could be or were designed to be fully automatic. Despite Anderson's attempts to divert the conversation, Rude continued to talk about guns and the conversion process. At one point Rude explained the difference between an AK47 and an AK74, and Anderson agreed to purchase an AK74 the following day. Anderson left the apartment. Later that evening, Rude called to ask if he was still interested in getting the gun. Anderson said he'd come by the next day to buy it.

The following day, May 5, 2010, Rude called Anderson to ask whether he was coming over, and said he was working on the gun. Anderson arrived about an hour later with $500 to purchase the AK47. Rude was in the dining area of the apartment, where Lori was helping him place a part inside an AK style rifle. They were having a difficult time, so Anderson was asked to help. Although inexperienced with the process, he helped finish the gun at Rude's direction. When the gun appeared to be finished, Rude told him he had a "machine gun" and explained how to check it and tell if it was fully automatic. Anderson paid the $500 and asked Rude how much money he makes on the deal. Rude said he makes about $40, but he enjoys the work. Anderson asked Lori if she helped with the conversions. She said she did, and liked doing it.

Anderson and Rude met briefly on May 13, 2010, during which time Rude received a phone call and spoke with someone about selling an AK rifle to them. On May 18, 2010, Anderson was in and out of the apartment, but at some point he and Rude discussed machine guns. Rude indicated that the more machine guns he sold to Anderson, the cheaper each would be. Rude then showed Anderson several weapons online that he said he could build, including a "Hitler's Buzz saw" for about $700. Anderson left the apartment and said he'd call later to let Rude know if he wanted to buy a couple of more guns.

3

Anderson called Rude later that day, and the two set up a time for Anderson to buy two more fully automatic weapons the next day.

On May 19, 2010, Anderson returned to the apartment to purchase the two guns. When he arrived, Rude and Lori were working on one of them. Rude told him one of the guns was complete, and he was finishing the second one. It took a couple of hours for Rude to complete the second gun, so Anderson engaged him in conversation. They covered several topics including removal of serial numbers from the guns, illegal gun activity, manufacturing weapons, and future builds and purchases. Once completed, Anderson tested both rifles, and they appeared to function as automatic rifles. He paid Rude $1,200.

On June 1, 2010, Anderson returned to the apartment and stayed for a little over an hour. When he arrived, he saw Rude sitting in his chair working on another AK style rifle with the parts in his lap. Rude explained that he was trying a new product that shortcuts having to weld holes closed on the weapons. Anderson helped him for a short time and asked if Rude could get him five more full auto rifles and if so, how long would it take. Rude said he could, and that it would take about two weeks, but he'd need half down so he could procure the necessary parts. If Anderson didn't put half down, it would take longer because Rude would have to come up with the money himself. Anderson asked about the four guns leaning against the wall. Rude indicated that he'd recently put them together, but they were weapons he wanted to keep for himself.

Anderson and Rude met again on June 8, 2010 regarding Anderson's interest in buying five more guns. Rude said he had sold three machine guns to friends, and that he had three other guns but didn't want to sell them. They agreed that Anderson would purchase only four guns, for which Anderson gave Rude a $1,000 partial payment. The next and final meeting took place on June 21, 2010. Anderson arrived at the apartment and noticed all the usual tools were in the living area plus two tools that were not normally there – a press and a Dremel tool. Anderson was almost immediately put to work building the machine guns. With direction from Rude and Lori, Anderson and Lori spent most of the day trying to fit pieces in to get the guns together. He and Lori also assisted Rude from time to time.

4

Only three guns were finished by the end of the day, and Anderson paid Rude $800 for those. Anderson and Rude left the apartment with the guns. Surveillance units approached them, and Rude was placed under arrest.

## DISCUSSION

To succeed on a claim for outrageous government conduct, Rude must establish that the government's conduct "violates fundamental fairness and is 'shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.'" *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008) (quoting *United States v. Gurrola*, 333 F.3d 944, 950 (9th Cir. 2003)). Merely infiltrating an organization, approaching persons it believes to be already engaged in or planning to participate in criminal activity, or even providing valuable and necessary items to the venture does not meet the standard. *Gurolla*, 333 F.3d at 950. Rather, the standard "is met when the government engineers and directs a criminal enterprise from start to finish." *Id.* Only one case in the Ninth Circuit has been found to meet the standard. *See Greene v. United States*, 454 F.2d 783 (9th Cir. 1972) (government conduct outrageous where undercover agent reestablished contact with defendants after their earlier arrest for bootlegging, and directly and continuously for two and a half year period, supplied the equipment and operator for an illegal still, supplied the sugar for the still at wholesale, urged them to resume production, made vague threats if they did not continue, and acted as the only customer for the illicit liquor).

This Circuit has developed a five factor for determining whether governmental conduct is considered outrageous. If the government can satisfy the following five factors, then its conduct is considered acceptable:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

5

*United States v. Bonanno*, 852 F.2d 434, 437-38 (9th Cir. 1988); *accord United States v. Williams*, 547 F.3d at 1199-1200.

All five factors are satisfied in this case. First, it was Rude, not the government, who devised the plan to buy cold war parts and use them to manufacture machine guns. *Bonanno*, 852 F.2d at 438 (noting that the government agent did not engineer or devise the criminal scheme); *see also United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007) (government conduct in connection with FBI agent's investigation was not outrageous, where "FBI did not actually create a criminal enterprise"); *United States v. Williams*, 791 F.2d 1383, 1386 (9th Cir.1986) (government conduct not outrageous where government encouraged, but did not devise, prison escape plan or provide the weapons used in the escape); *United States v. Citro*, 842 F.2d 1149, 1153 (9th Cir.1988). Anderson's first visit revealed that Rude already possessed the equipment he needed to make the weapons; he told Anderson at that time that he builds them and had ten completed weapons at another location. Later, he showed Anderson several weapons online that he said he could build, and Anderson saw such rifles at Rude's apartment on several occasions. Clearly Rude was involved in making machine guns before Anderson said he'd like to buy some. *See Bonanno*, 852 F.2d at 437; *Williams*, 547 F.3d at 1200. The first *Bonanno* factor is met.

In his Reply (#33), Rude attacks the government's ability to satisfy the second factor. Rude argues that because he is paraplegic with limited use of his hands and lack of funds, he would not have been able to engage in the crime but for the government's financial assistance and Anderson's physical assistance with building the guns. The record does not support such a theory. When writing about his first time helping to build a gun on May 5, 2010, Anderson unequivocally states, "I helped Bobby work on the gun *and could only help with his direction, due to my lack of experience with the process*." Continuation Report, Exh. A to Opp'n (#32) at 3 (emphasis added). Moreover, even were Anderson unavailable to assist Rude, he was not Rude's only easy outlet to complete the manufacture of the weapons. Anderson not only observed Lori helping to build the guns; she told him that she helped make the guns, liked the work, but was not yet good enough to make them herself. *Id.*

1    Nor was the government's payment necessary for Rude to engage in the manufacture of the
2 machine guns. Most notably, Rude was manufacturing the weapons prior to the government's
3 involvement. While it's true that Rude was able to make the three additional machine guns for purchase
4 on June 21, 2010 more quickly because of the government's half payment, Anderson's Continuation
5 Report indicates that Rude "told me that if I could get the ½ down he could do it sooner, *if not it would*
6 *take longer because he needed to come up with the money.*" Exh A. to Opp'n (#32) at 5 (emphasis
7 added). In any event, merely providing funds and opportunity to commit a crime does not amount to
8 outrageous conduct. *See e.g. United States v. Wiley*, 794 F.2d 514, 516 (9th Cir. 1986) (providing drugs
9 to activate a preexisting smuggling plan acceptable government conduct);*United States v. So*, 755 F.2d
10 1350, 1354 (9th Cir. 1985) (providing funds and opportunity to launder money acceptable).
11 Additionally, Anderson was not Rude's only customer. *See Greene*, 454 F.2d at 787 ("throughout the
12 entire period involved, the government agent was the only customer of the illegal operation he had
13 helped to create"). Rude indicated that he made guns for friends and on one occasion took a call in front
14 of Anderson, the subject of which appeared to be the sale of machine guns. The second factor is
15 therefore satisfied.

16    The last three *Bonanno* factors likewise are easily met. Anderson's rental of the apartment and
17 his offers to buy firearms enabled him to easily "infiltrate" Rude's preexisting gun-making operation.
18 *Bonanno*, 582 F.2d at 438. Although it was Anderson who first suggested that he'd like to buy full
19 automatic weapons, this is best characterized as a "stratagem to ferret out criminal activity," and not
20 outrageous government conduct. *See Williams*, 547 F.3d at 1200. Finally, Rude was clearly "already
21 contemplating or engaged in criminal activity." *Bonanno*, 582 F.2d at 438; *Williams*, 547 F.3d at 1200.
22 The facts presented here do not support a finding that the government "engineer[ed] and direct[ed] the
23 criminal enterprise from start to finish," as required to establish this defense. *Bonanno*, 852 F.2d at 438
24 (citation and internal quotations omitted). In fact, just the opposite is true.
25 . . .
26 . . .

7

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Robert Rude's Motion to Dismiss for Outrageous Government Conduct (#25) should be denied.

DATED this 6th day of June, 2011.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**